IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  | CV 22–127–M–DWM |
| --- | --- |
| IN RE: CONDITIONS AT LAKE COUNTY JAIL | OPINION and ORDER |

Plaintiffs are inmates at the Lake County Jail in Polson, Montana who allege their conditions of confinement violate the First, Eighth, and Fourteenth Amendments of the United States Constitution, as well as the Hellgate Treaty of 1855. (Doc. 8.) Defendant Governor Greg Gianforte (the "Governor" or "Gianforte") seeks to dismiss all claims and crossclaims against him under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 27.) Argument on the motion was heard on November 1, 2022. Because the Governor is immune from suit pursuant to the Eleventh Amendment, his motion is granted.

**BACKGROUND**[1]

Plaintiffs' First Amended Complaint includes four claims related to conditions of confinement at the Lake County Jail and two classes of inmate: a Conditions Class and a Confederated Salish and Kootenai Tribal Members Subclass.[2]  (Doc. 8 at 13–15.)  Only two counts are at issue here, Count 1 and 3. Count 1, on behalf of the Conditions Class against Lake County, and the Tribal Members Subclass against all Defendants, alleges that Lake County and the Governor, acting as the State of Montana through its administration of Public Law 280 ("PL 280"), have deprived Plaintiffs of their Sixth, Eighth, and Fourteenth Amendment rights.  (*Id.* at 13.)  The rights specifically mentioned, but without limitation, are rights to due process and equal protection, to be free of cruel and unusual punishment, and of access to the courts.  (*Id.* at 13–14.)  Count 3 alleges, on behalf of the Tribal Members Subclass, that Defendants have deprived these plaintiffs of the "right to adequate and cost-free medical care secured to them through the Hellgate Treaty of 1855."  (*Id.* at 14.)  Plaintiffs seek declaratory and injunctive relief on all claims, and monetary damages for the Tribal Members

---

[1] A more complete background is provided in the October 11, 2022 Class Certification Order.  (*See* Doc. 49.)

[2] On October 11, 2022, the Court certified the following Conditions Class: "All persons incarcerated at Lake County Jail as of September 3, 2021 to the present, as well as all current and future inmates."  (*See* Doc. 49.)  Plaintiffs' request to certify the Tribal Members Subclass was denied.  (*See id.*)

Subclass for medical costs. (*Id.* at 16–17.)  Defendant Lake County also crossclaimed against the Governor, asserting that he is responsible for funding and administering the State's PL 280 obligations, and therefore, the Jail. (Doc. 21.)

## I.    Hellgate Treaty of 1855

In 1855, the United States and what became known as the Confederated Salish and Kootenai Tribes ("CSKT") entered into the Hellgate Treaty, 12 Stat. 975, creating the Flathead Reservation. *CSKT v. Jewell*, 2015 WL 12748309, at *1 (D. Mont. May 18, 2015).  Pursuant to that Treaty, the CSKT "ceded to the United States most of their aboriginal lands in Montana and Idaho, reserving for their exclusive use the Flathead Indian Reservation—1,245,000 acres in western Montana." *CSKT v. Lake Cnty. Bd. of Comm'rs*, 454 F. Supp. 3d 957, 961 (D. Mont. 2020).  In exchange, the United States promised, *inter alia*, "[t]o erect a hospital, keeping the same in repair, and provided with the necessary medicines and furniture, and to employ a physician . . . The said buildings and establishments to be maintained and kept in repair as aforesaid, and the employees to be kept in service for the period of twenty years."  Treaty, art. 5.

In 1976, Congress passed the Indian Health Care Improvement Act, which established the Indian Health Service and recognized a "major national goal of the United States is to provide the quantity and quality of health services which will permit the health status of Indians to be raised to the highest possible level."  Pub.

L. 94-437, 90 Stat. 1400 (codified as amended at 25 U.S.C. §§ 1601, 1661).

Because the CSKT "is federally-recognized, its members are eligible to receive

healthcare from the [Indian Health Service]." *Rosebud Sioux Tribe v. United States*,

9 F.4th 1018, 1021 (8th Cir. 2021). However, CSKT established its own healthcare

system on the Flathead Indian Reservation, which means the United States provides

as much funding to the tribal system as it would provide to facilities within the

Service. 25 U.S.C. § 1602(7). Here, Plaintiffs' challenge is based on *access* to

these federally funded services, not the sufficiency of the services themselves. (*See*

Doc. 41 at 13 n.4.)

## II.   Public Law 280

In 1953, Congress enacted Public Law 280 or "PL 280" to grant certain states

criminal jurisdiction over Indians on reservations and to allow civil litigation that

had come under tribal or federal court jurisdiction to be handled by state courts.

*See* 18 U.S.C. § 1162; 67 Stat. 590. Although Montana was not one of the states

originally named in the law, PL 280 § 7 permitted Montana to assume such

jurisdiction. *Lozeau v. Ancioux*, 449 P.3d 830, 832 (Mont. 2019); *see* 25 U.S.C.

§ 1321. In 1963, the State voluntarily established a consent procedure with the

CSKT. *See* Mont. Code Ann. §§ 2–1–301 to –307. Consistent with this process,

the CSKT enacted an ordinance on May 16, 1964, consenting to the State's exercise

of concurrent criminal jurisdiction; the ordinance was clarified on May 5, 1965, to

include consent to civil jurisdiction. *Lozeau*, 449 P.3d at 833.  On June 30, 1964—

and then again on October 8, 1965—then-Governor Tim Babcock issued a

proclamation giving effect to the State's assumption. *See id.*; § 2–1–302.  In 1993,

the CSKT later withdrew their consent to State jurisdiction over criminal

misdemeanors, which was affirmed on September 30, 1994 via proclamation by

then-Governor Marc Racicot. *Lozeau*, 449 P.3d at 833; § 2–1–306.  As it relates to

the interplay between PL 280 and the Hellgate Treaty, PL 280 is recognized as a

"valid abrogation of a tribe's jurisdictional treaty rights." *Lozeau*, 449 P.3d at 834.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6),[3] "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.*  Dismissal is

appropriate "where there is no cognizable legal theory or an absence of sufficient

---

[3] Dismissal based on Eleventh Amendment immunity is generally analyzed under
Rule 12(b)(6) and not as a jurisdictional issue under Rule 12(b)(1). *See Steshenko
v. Albee*, 70 F. Supp. 3d 1002, 1008 n.1 (N.D. Cal. 2014) (collecting cases).
Regardless, those standards are essentially the same for the purposes of this motion.

facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (quotation marks omitted).

ANALYSIS

Governor Gianforte is entitled to Eleventh Amendment immunity as it relates to both Plaintiffs' claims and Lake County's crossclaim.  Moreover, Plaintiffs lack standing to bring a claim premised on a collective right enshrined in the Hellgate Treaty.  Accordingly, the Governor is dismissed from this action.

## I.    Eleventh Amendment

Plaintiffs allege that "[t]hrough Public Law 280, the State of Montana assumed criminal jurisdiction over major crimes committed on the Flathead Indian Reservation," and that the assumption of this "jurisdiction necessarily carries with it attendant responsibilities to tribal members, including those secured through the Hellgate Treaty of 1855" and the Constitution.  (Doc. 41 at 8; Doc. 8 at ¶ 50.)  Likewise, Lake County alleges a crossclaim against Gianforte for contribution or indemnification on the ground that Gianforte, as "the chief executive office of the State," is ultimately responsible for funding the State's assumption of criminal jurisdiction under PL 280.  (Doc. 21 at 14–16.)

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021).  The Eleventh Amendment provides that "[t]he

6

Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. Accordingly, the Eleventh Amendment protects states from suits brought by individuals in federal court. *See Coal. to Defend Aff. Action v. Brown*, 674 F.3d 1128, 1133 (9th Cir. 2001). Nevertheless, under what is known as the *Ex parte Young* exception, "the Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities." *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (citing *Ex Parte Young*, 209 U.S. 123, 155–56 (1908)). "An entity invoking Eleventh Amendment immunity bears the burden of asserting and proving those matters necessary to establish its defense." *See Sato v. Orange Cnty. Dep't of Edu.*, 861 F.3d 923, 928 (9th Cir. 2017) (quotation marks omitted). The Governor has met that burden here, arguing that (1) the claims arise under state, as opposed to federal, law; (2) Plaintiffs and Lake County improperly seek an order directing payment of funds from the State Treasury; and (3) there is no connection between the Governor and the alleged harm.

    **A.**    **Waiver**

As a threshold matter, Lake County argues that the Governor waived his

sovereign immunity through the State's assumption of PL 280.  He did not.

Montana's implementing statute for PL 280 states:

> (1) The state of Montana hereby obligates and binds itself to assume, as
> provided in this section, criminal jurisdiction over Indians and Indian
> territory of the Flathead Indian reservation and country within the state
> in accordance with the consent of the United States given by the act of
> August 15, 1953 (Public Law 280, 83rd congress, 1st session).
>
> (2) Unless the Confederated Salish and Kootenai tribes or Lake County
> withdraws consent to enforcement pursuant to 2-1-306, the state shall
> reimburse Lake County for assuming criminal jurisdiction under this
> section annually to the extent funds are appropriated by the legislature.
> The annual amount of reimbursement must be adjusted each year based
> on the consumer price index.

§ 2–1–301.  This language is insufficient to waive immunity, however, as

> [t]o be a valid waiver, a state's consent to suit must be unequivocally
> expressed in the statutory text.  There can be no consent by implication
> or by use of ambiguous language.  Courts must indulge every reasonable
> presumption against waiver, and waivers must be construed strictly in
> favor of the sovereign and not enlarged beyond what the statutory
> language requires.

*Holley v. Cali. Dep't of Corrections*, 599 F.3d 1108, 1111–12 (9th Cir. 2010)

(cleaned up) (citations omitted).  Contrary to Lake County's position, nothing in

§ 2–1–301 "unequivocally expresse[s]" a waiver of sovereign immunity.  *Id.* at

1111.  The statutory language does not address immunity at all, let alone

unambiguously waive such immunity.  Accordingly, Plaintiffs' and Lake County's

only recourse is through *Ex parte Young*.

## B.     Nature of the Claims

*Ex parte Young* does not apply when a plaintiff's claims are based on

violations of state, as opposed to federal, law.  As the Supreme Court has explained,

"the need to promote the supremacy of federal law must be accommodated to the

constitutional immunity of the States."  *Pennhurst St. Sch. & Hosp. v. Halderman*,

465 U.S. 89, 105 (1984).  Consistently,

> [t]his need to reconcile competing interests is wholly absent . . . when a
> plaintiff alleges that a state official has violated *state* law.  In such a case
> the entire basis for the doctrine of *Young* . . . disappears.  A federal
> court's grant of relief against state officials on the basis of state law,
> whether prospective or retroactive, does not vindicate the supreme
> authority of federal law.  On the contrary, it is difficult to think of a
> greater intrusion on a state sovereignty than when a federal court
> instructs state officials on how to conform their conduct to state law.
> Such a result conflicts directly with the principles of federalism that
> underlie the Eleventh Amendment.  We conclude that *Young* . . . [is]
> inapplicable in a suit against state officials on the basis of state law.

*Id.* at 106; *see also Steshenko v. Gayrard*, 44 F. Supp. 3d 941, 950 (N.D. Cal. 2014)

("[T]he *Ex parte Young* exception applies only where the state officials are

allegedly violating federal law; it does not reach suits seeking relief against state

officials for violations of state law.").

Both Plaintiffs' and Lake County's claims against the Governor are premised

on the State's assumption of criminal jurisdiction over the Flathead Indian

Reservation through PL 280.  Nonetheless, while Plaintiffs' underlying claims arise

under the federal constitution (Count 1) and the Hellgate Treaty (Count 3), Lake

9

County seeks contribution and indemnification under state law. *See Hoa v. Riley*, 78 F. Supp. 3d 1138, 1146 (N.D. Cal. 2015) (explaining that indemnification and contribution are not cognizable under § 1983 and collecting cases to that effect) As such, Lake County's crossclaim does not fall within the purview of *Ex parte Young*, and there is no exception to the Governor's Eleventh Amendment immunity.

Moreover, *Ex parte Young* limits injunctions that implicate the State's treasury. "*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury . . . or an order for specific performance of a State's contract." *Council 31 of the Am. Fed'n of St. Cnty., & Muni. Empls., AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012) (quoting *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 256–57 (2011)). "True, prospective relief of an ongoing federal violation will often require state officials to dip into a state's treasury to comply with a court's order." *Id.* Such "ancillary effect" is "a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*." *Id.; see also Eu*, 979 F.2d at 704 ("[R]elief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury." (Quotation marks omitted)). "Nevertheless, where a plaintiff's request for relief would have an effect upon the state treasury that is not merely ancillary but is the essence of the relief sought, it is barred by the Eleventh

10

Amendment." *Quinn*, 680 F.3d at 882–83.  Because direct payment of contribution or indemnity is precisely the relief sought here, Lake County's crossclaim is barred.

### C.   Causal Connection

Although Plaintiffs have alleged underlying federal claims, the *Ex parte Young* exception only applies so long as there is a connection between the alleged misconduct and the individual state officer.  *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004).  This connection "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Eu*, 979 F.2d at 704.  As such, this connection is subject to two inquiries: "first, whether there is the requisite causal connection between their responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress" and second, whether there is a connection between the officer "and enforcement of a challenged state law." *Planned Parenthood of Idaho, Inc.*, 376 F.3d at 919.  Both are lacking here.

Gianforte argues that Plaintiffs do not allege that the Governor has "any authority over the conditions or policies at Lake County Jail, played any personal role in creating or prolonging those conditions or policies, or had any other connection to Plaintiffs' alleged injuries." (Doc. 28 at 6–7.)  In response, Plaintiffs insist that the question under *Ex parte Young* "is whether the Governor's duties

provide a sufficient nexus to Plaintiffs' claims for relief." (Doc. 41 at 15.)
Although Plaintiffs recognize that general duty not enough, they argue that a
specific duty is, and that such a duty exists here. Gianforte has the better argument.

Plaintiffs allege that while the Governor has a general duty to enforce the
law, *see* Mont. const. art. IV, § 4(1), and to communicate with other sovereigns,
§ 2–15–143, he has a specific duty to implement and enforce PL 280. (*See* Doc. 42
at 13 ("[T]he Governor is *the* connection for implementation and enforcement of PL
280 because without the Governor it would not be functional.").) As an initial
matter then, this case is distinguishable from the many cases cited by the Governor
where the plaintiff relied solely on a general enforcement power. (*See* Doc. 50 at
5–6 (collecting generalized duty cases)); *Ass'n des Eleveurs de Canards et d'Oies
du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) ("Governor Brown is
entitled to Eleventh Amendment immunity because his only connection to [the
statute] is his general duty to enforce California law."). Whether PL 280 provides
the necessary connection, however, is less clear. As discussed above, § 2–1–301
provides that Montana assumed "criminal jurisdiction over Indians and Indian
territory of the Flathead Indian reservation and country within the state," § 2–1–
301(1), and must "reimburse Lake County for assuming criminal jurisdiction under
this section annually to the extent funds are appropriated by the legislature," § 2–1–
301(2).

12

In support of the alleged connection created by § 2–1–301, Plaintiffs rely heavily on the Ninth Circuit's decision in *Eu*, where the plaintiffs challenged the constitutionality of a California statute prescribing the number of judges on the Superior Court for Los Angeles County. *See* 979 F.2d at 699. The plaintiffs sued a number of California officials, including its governor, asserting "that a shortage of state judges cause[d] inordinate delays in civil litigation, depriving litigants of access to the courts" and "equal protection of the laws because it forces them to suffer longer delays than litigants in neighboring counties." *Id.* The court held that the requisite "connection" existed under *Ex parte Young* because Wilson, California's governor, "ha[d] a duty to appoint judges to any newly-created judicial positions" and Eu, California's secretary of state, "ha[d] a duty to certify subsequent elections for those positions." *Id.* at 704. Thus, the court concluded that both "Eu and Wilson have a specific connection to the challenged statute." *Id.*

Unlike *Eu*, however, Montana's PL 280 statute lacks a "fairly direct" connection to Plaintiffs' alleged injuries or the Governor's ability to redress them. At oral argument, Plaintiffs relied heavily on prior gubernatorial proclamations to demonstrate the Governor's role in the consent process. *See, e.g.*, § 2–1–302 (requiring the governor to "issue within 60 days a proclamation" of consent authorization); § 2–1–303 (explaining that a gubernatorial proclamation under § 2–1–302 is what triggers the State's obligation). But that consent process is

completely beside the point insofar as Plaintiffs challenge the conditions of confinement at the Lake County Jail. Unlike in *Eu*, where the governor's appointment of judges would directly alleviate the judicial backlog harming the plaintiffs, the Governor's connection to the living conditions at a county detention facility is tenuous at best. Gianforte can neither unilaterally alter the exercise of PL 280 jurisdiction, *see* § 2–1–306 (requiring the governor to "issue a proclamation" but only following a CSKT resolution to withdraw consent), nor provide a specific remedy related to administration of the Lake County Jail, *see* §§ 7–32–2201, *et seq.*; *Moralli v. Lake Cnty., Mont.*, 839 P.2d 1287, 1290 (Mont. 1992) ("Lake County had a duty to provide Moralli with a reasonably safe accommodation during the period of her incarceration."). *Compare with Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1110 (E.D. Cal. 2002) (finding sufficient causal connection under *Ex parte Young* where "[t]he Governor negotiated and approved the compacts that give rise to the plaintiffs' alleged injuries."). And, to the extent Plaintiffs seek to force the Governor to appropriate funds to address their harms, such a claim both falls outside of his sole authority, *see Meyer v. Knudsen*, 510 P.3d 1246, 1250 (Mont. 2022) (explaining that "[a]n appropriation . . . is something within the prerogative of the Legislature"), and runs afoul of *Ex parte Young, see Quinn*, 680 F.3d at 882–83.

Accordingly, Plaintiffs' claims against the Governor are also barred by the Eleventh Amendment.

## II.   Hellgate Treaty

Plaintiffs have also asserted a claim under the Hellgate Treaty, alleging in Count 3 that the Governor, in conjunction with Lake County, deprived Plaintiffs "of the right to adequate and cost-free medical care secured to them through the Hellgate Treaty." (Doc. 8 at ¶ 54.) To the extent this claim is independent from the Governor's PL 280 obligation— a tenuous proposition—it fails for lack of standing.

The Governor argues that "Plaintiffs lack standing to enforce the Hellgate Treaty of 1855 because treaty rights may only be asserted by the Tribe, not its individual members." (Doc. 28 at 10.) In response, Plaintiffs insist that "§ 1983 provides an appropriate procedural vehicle for individual enforcement of treaty rights." (Doc. 41 at 23.) While Plaintiffs are ultimately correct that there are circumstances under which an individual tribal member can sue a non-party based on its interference with tribal treaty rights, such circumstances do not exist here.

"A treaty is essentially a contract between two sovereign nations." *Herrera v. Wyoming*, 139 S. Ct. 1686, 1699 (2019) (quotation marks omitted). But because tribes are not "persons" for purposes of § 1983, *see Skokomish Indian Tribe v. United States*, 410 F.3d 506, 514 (9th Cir. 2005) (en banc) ("[A] Tribe is not a 'person' capable of bringing a claim under section 1983 for violation of a sovereign

15

prerogative."); *see also Inyo Cnty v. Paiute-Shoshone Indians*, 583 U.S. 701, 708–12 (2003), such suit could only be undertaken by individual tribal members. The Ninth Circuit has therefore "suggested that some treaty-based rights might be cognizable on behalf of a tribe's members under section 1983." *Skokomish Indian Tribe*, 410 F.3d at 515. The dispositive inquiry is whether "the right asserted 'is one that protects the individual against government intrusion.'" *Id.* (quoting *Hoopa Valley Tribe v. Nevins*, 881 F.2d 657, 662 (9th Cir. 1989)); *see Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 n.5 (9th Cir. 1991) (recognizing individual § 1983 claim based on treaty rights exists under "specified circumstances"). "[T]raditional section 1983 suits—for example, those challenging an arrest on tribal land—seek to vindicate an 'individual right.'" *Chemehuevi Indian Tribe v. McMahon*, 934 F.3d 1076, 1082 (9th Cir. 2019) (cleaned up).

In Count 3, Plaintiffs claim that they were denied adequate medical care pursuant to the Hellgate Treaty, under which the United States promised to erect a hospital and employ a physician. Treaty, art. 5. As such, Plaintiffs' treaty-based healthcare claim is not a "traditional" § 1983 claim. While it "may appear more akin to a § 1983-type civil right than the right" to self-government, *see Hoopa Valley Tribe*, 881 F.2d at 663, or the right to take fish, *see Skokomish Indian Tribe*, 410 F.3d at 515, it remains a right "grounded in treat[y], as opposed to specific federal statute or the Constitution," *Hoopa Valley Tribe*, 881 F.2d at 663.

16

Moreover, the requirement that the United States government provide a hospital and physician confers no individual right that protects an individual against government intrusion. *See id.* Because Plaintiffs "seek to vindicate communal, rather than individual rights, they do not have cognizable section 1983 claims against the [Governor]."[4] *Skokomish Indian Tribe*, 410 F.3d at 515.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that the Governor's motion to dismiss (Doc. 27) is GRANTED.  Both Plaintiffs' claims and Lake County's crossclaim against Governor Gianforte are DISMISSED WITH PREJUDICE.

Dated this 2nd day of November, 2022.

_____
Donald W. Molloy, District Judge
United States District Court

_____

[4] Although the present motion regards only the Governor, Plaintiffs' treaty-based claims against the County face the same challenge.

17